UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

**Caption in Compliance with D.N.J. LBR 9004-1(b)**
K&L Gates LLP
One Newark Center
1085 Raymond Boulevard, 10th Floor
Newark, NJ 07102
Telephone: (973) 848-4000
Facsimile: (973) 848-4001
Daniel.Eliades@klgates.com
Caitlin.Conklin@klgate.com
*Attorneys for Wyckoff Equities, LLC*
Daniel M. Eliades, Esq. (DME-6203)
Caitlin C. Conklin, Esq. (CCC-5117)

| | |
|---|---|
| In Re:<br><br>WYCKOFF EQUITIES, LLC<br><br>Debtor. | Chapter 11<br>Case No. 23-16874 |

### CERTIFICATION OF ALBERT FRANCO IN SUPPORT OF
### FIRST DAY MOTIONS AND APPLICATIONS OF WYCKOFF EQUITIES, LLC

I, Albert Franco, being of full age, certify pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

**A.    BACKGROUND**

1.    I am the sole member of Wyckoff Equities, LLC, the debtor and debtor-in-possession ("Debtor"). I am familiar with the Debtor's business affairs and am authorized to make this certification on Debtor's behalf. This certification is based on my personal knowledge; a review of the records of Debtor; a review of publically available information; and information available through representatives of Debtor.

2. On August 4, 2023, (the "Petition Date"), Debtor filed a voluntary petition for relief pursuant to chapter 11 of the United States Bankruptcy Code. Since the Petition Date, Debtor has remained in possession of its assets and has continued management of its business and affairs.

3. Debtor is a "small business debtor" as defined by 11 U.S.C. §101(51D) and has elected to proceed under Subchapter V per 11 U.S.C. §1181 et. seq.

B. **THE DEBTOR'S BUSINESS**

4. Debtor is a New Jersey limited liability company which operates Albert's Ho-Ho-Kus located at 4 Sycamore Avenue, Ho-Ho-Kus, New Jersey. Albert's Ho-Ho-Kus is a BYOB Italian American bistro that seats 62 patrons and has earned +four-star reviews from *Yelp*, *Trip Advisor*, and *Google Review*.

5. Debtor employs approximately 31 people. Debtor's monthly payroll ranges from approximately $110,000 to $118,000.

6. Debtor's assets consist of deposit account balances, equipment, furnishings, office equipment and supplies typically used in the restaurant business, as well as Debtor's good will. Debtor also has an ownership interest in an entity that operates a yoga studio.

C. **FACTORS PRECIPITATING THE DEBTOR'S CHAPTER 11 FILING**

7. Debtor has operated a successful restaurant at 4 Sycamore Avenue, Ho-Ho-Kus, New Jersey since 2008.

8. In recent years, Debtor has encountered various financial and operational challenges. First, a fire ravaged the restaurant causing a cessation of operations from November 12, 2019 to September 12, 2020. The fire required a complete restoration and renovation of the kitchen, dining and service areas – causing the restaurant to be non-operational for nearly a year. This extended

closure required a rebranding and a reintroduction to the community as well as a rebuilding of our customer loyalty program.

9. Wyckoff Equities' recovery from the fire was devastated by the Covid-19 pandemic and resulting government mandated closing/restriction on indoor dining. The negative financial impact of the pandemic on Wyckoff Equities (and the restaurant industry in general) was unprecedented.

10. Most recently, Wyckoff Equities suffered from an incredible rise in food costs and other inflationary pressures that increased its operating costs significantly. For example, the price of chicken pre-pandemic was $1.40 per pound; post pandemic the cost of the same item is 300% higher at $4.26 lb. Our produce bill is 280% higher on average. Our food cost as a whole has risen approximately 80%.

D. **THE SBA LOAN**

11. On June 24, 2020, Debtor obtained a disaster loan of $150,000 from the U.S. Small Business Administration (the "SBA") as working capital to alleviate economic injury caused by the pandemic. Effective July 24, 2021, the amount of the SBA loan was increased to $500,000. Effective March 3, 2022, the amount of the SBA loan was increased to $2,000,000. To secure payment of the loan, Debtor granted SBA a security interest on most, if not all, of its personal property. The SBA is the Debtor's senior secured lender. The security interest granted to SBA was perfected by the filing of UCC-1 Financing Statement on July 5, 2020 with the State of New Jersey, filing number 54429642.

12. Wyckoff Equities fell behind on its installment payments to the SBA. The outstanding installment payments due to the SBA through June, 2023 totaled $69,097 (the "Arrears"). By letter of June 23, 2023, Wyckoff Equities proposed to (i) going forward, make the

315500702.3

scheduled installment payments due under the note of $9,871 per month, and (ii) satisfy the Arrears via twelve (12) monthly payments of $5,758.08 commencing on July 15, 2023 and continuing on the fifteenth (15th) day of each of the next eleven (11) months.

13. Wyckoff Equities paid SBA the scheduled installment payments due under the note of $9,871 for the months of July and August, 2023. In addition, Wyckoff Equities made a payment to the SBA of $5,758.08 on July 15, 2023 on account of the Arrears.

14. Post-petition, Debtor intends to continue to pay the SBA the scheduled monthly installment payments due under the note of $9,871 – with the next payment coming due on September 1, 2023. Debtor intends to propose a plan of reorganization to pay the SBA the balance of the Arrears as and when set forth in the plan.

E.    **THE JUNIOR LENDER LOANS**

15. From January 25, 2023 through April 21, 2023, Debtor obtained loans from PIRS Capital LLC, Vox Funding and 800 Funding (collectively, the "Junior Lenders"). The face amount of the loans totaled $465,000, however, Debtor received less than that amount from the Junior Lenders.

16. Upon information and belief, Junior Lenders claim to have acquired future accounts receivable of Debtor. Debtor contests any "true sale" contention of Junior Lenders. After accounting for the security interest of the SBA, Debtor believes that the loans of the Junior Lenders are all undersecured/unsecured.

17. Debtor's agreements with Junior Lenders call for Debtor to make weekly payments to Junior Lenders, totaling approximately $67,500 per month. These payments were made by Junior Lenders sweeping Debtor's operating account on a weekly basis -- severely straining cash flow and

jeopardizing the ability of Debtor to satisfy its operating expenses, tax obligations, as well as its debt service obligations to the SBA.

18. Debtor advised each of the Junior Lenders of its financial condition and the negative impact of the weekly sweeps on Debtor's business. Debtor expressed its desire to discuss restructuring its agreements with all of the Junior Lenders. Debtor also advised that in order to avoid financial harm to Debtor, which could threaten its viability to the detriment of all interested parties, Debtor requested that Junior Lenders immediately forbear from all debiting of Debtor accounts. None of the Junior Lenders were amenable to a forbearance agreement.

19. Pre-petition, Debtor also proposed modified payment plans to each of the Junior Lenders – extending the repayment terms of the loans of the Junior Lenders. None of the Junior Lenders was amenable to the consensual restructuring proposed by Debtors.

**F.    THE IMPETUS OF THE BANKRUPTCY FILING**

20. On June 2, 2023, 800 Funding initiated a lawsuit against Debtor and myself by filing a complaint in the Supreme Court of New York County of Kings, *800 Funding v. Wyckoff Equities, L.L.C. et al.*, Index No. 516193/2013 (the "NY Action").

21. On June 2, 2023, the same day that it filed the NY Action, 800 Funding sent Toast, Inc. ("Toast"), Debtor's credit card processor, a *UCC Lien Notice and Notice of Power of Attorney Granted by Debtor to Velocity Capital Group LLC d/b/a 800 Funding Granting Velocity Capital Group LLC d/b/a 800 Funding Power of Attorney Over Debtor* (the "800 Funding Notice"). 800 Funding never provided Wyckoff Equities with a copy of the 800 Funding Notice.

22. As a result of the 800 Funding Notice, Toast withheld from Debtor net deposits of $44,712.80 (the "Net Deposits"). By letter of July 12, 2023, counsel for Wyckoff Equities demanded that that (i) Toast immediately remit or make available the Net Deposits to Wyckoff Equities, (ii)

5

Toast make any other net deposits available to Wyckoff Equites, without delay or diversion, pursuant to the terms of the parties' agreements, and (iii) Toast immediately provide any document, including correspondence and e-mails, in its regarding the purported "garnishment" of the Net Deposits and/or the failure of Toast to make the Net Deposits available to Wyckoff Equities. Not until July 27, 2023 did Toast respond to Debtor; advising that the Net Deposits were withheld by Toast because of the 800 Funding Notice.

23.     The seizure of nearly $45,000 of its cash caused significant harm to Wyckoff Equities and is the impetus of Debtor's bankruptcy filing. If Toast and/or 800 Funding continue to refuse to remit and release the Net Deposits to Debtor, Debtor intends to file an adversary proceeding seeking that and other relief.

**G.     POST PETITION OPERATIONS AND OUTLOOK**

24.     Debtor believes that its revenue will increase and stabilize as the area recovers from the pandemic and consumers fully return to restaurant dining. Debtor also believes that the spike in inflation – particularly regarding food costs will subside, resulting in a reduction in certain operating expenses.

25.     Debtor plans to increase revenue by extending hours of operation, increasing catering revenue, and increasing menu prices. Debtor plans to decrease costs by restructuring the FOH and BOH payroll overall, further exploring vendors options, and revising menu options to increase profitability.

26.     I believe that Debtor's restaurant business is viable and that a restructuring of its debts will enable it to successfully reorganize and continue as a going concern.

**H.     RELIEF REQUESTED**

27.    Debtor has requested that the Court consider, on an expedited basis, the following motions:

a.    Debtor's Motion for an Order Authorizing the Emergency or Interim Use of Cash Collateral pursuant to 11 U.S.C. §363;

b.    Debtor's Motion for an Order Authorizing Debtor to Pay Pre-Petition Wages, Salaries, Compensation, Employee Benefits and Reimbursable Business Expenses up to the Limits Set Forth in 11 U.S.C. §507(a);

c.    Debtor's Motion to Maintain Existing Bank Accounts and to Continue to Use its Existing Cash Management System and Business Forms;

d.    Debtor's Motion for an Interim Order and a Final Order (i) Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, (ii) Deeming Utility Companies to Have Adequate Assurance of Payment, and (iii) Establishing Procedures for Resolving Requests for Additional Assurance pursuant to 11 U.S.C. § 366;

(collectively, the "First Day Motions").

28.    The First Day Motions are intended to facilitate Debtor's transition into chapter 11 and an orderly reorganization. The First Day Motions are critical to Debtor's efforts to reorganize for the benefit of its creditors (and employees).

**A.    Motion for an Order Authorizing the Emergency Use of Cash Collateral Pending the Noticing and Scheduling of an Interim or Final Hearing pursuant to 11 U.S.C. § 363 and Federal Rule of Bankruptcy Procedure 4001.**

29.    Submitted herewith is Debtor's motion for the entry of an order authorizing the Debtor to use the cash collateral of the SBA (and to the extent applicable, the Junior Lenders) (the "Cash Collateral Motion").

30.    Attached to the Cash Collateral Motion is a budget through year end prepared by Debtor. Debtor believes that the budget will provide sufficient operating capital to allow Debtor to operate for such period.

7

31. Debtor requires the immediate and emergent use of the Cash Collateral to meet its operating expenses. Without the immediate use of cash collateral, Debtor will be unable to meet its ordinary cash needs (and such other purposes as may be approved in writing by the SBA) such as payment of actual expenses of Debtor necessary to (a) maintain and preserve its assets, and (b) continue the operation of its business.

**B.    Debtor's Motion for an Order Authorizing Debtor to Pay Pre-Petition Wages, Salaries, Compensation, Employee Benefits and Reimbursable Business Expenses up to the Limits Set Forth in 11 U.S.C. §507(a).**

32. Also submitted herewith is a motion for an order authorizing Debtor to pay pre-petition wages, salaries, compensation, employee benefits and reimbursable business expenses up to the limits set forth under 11 U.S.C. §507(a) (the "Wage Motion").

33. As set forth in the Wage Motion, as of, and prior to the Petition Date, the Debtor employed approximately 31 people. Debtor's most recent payroll was issued on July 31, 2023 for the period July 16, 2023 through July 23, 2023. These wages total approximately $27,960.40. On August 7, 2023, Debtor will be required to pay its employees accrued wages for the period July 24, 2023 through July 30, 2023, which includes seven pre-petition work days, totaling approximately $25,000.

34. Debtor is required to withhold taxes from wages paid to its employees. Debtor estimates that the withholding taxes to be paid for the week ending July 30, 2023 will be approximately $11,500.00 and for the pre-petition wages earned for the week ending August 6, 2023 will be approximately $3,275.00 for a total of $14,775.00.

35. Debtor seeks authorization to pay their wages and related compensation to the employees that were earned during the accrued pre-petition and the related state, federal and local taxes. Debtor's budget provides sufficient funds to pay these wages.

36. Debtor issued checks to all of its employees for its last regular payroll. Debtor is requesting that the court enter an order authorizing Debtor to issue replacement checks, if necessary, and further authorizing its bank or payroll service to honor all checks for pre-petition wages and commissions that have been issued to its employees but not yet presented for payment or that have yet to clear through the banking system.

37. Debtor also is required by law to withhold from its employee's wages all applicable federal, state, and local income taxes, state unemployment taxes and social security and medical taxes (collectively the "Trust Fund Taxes"). Debtor transfers such amounts withheld from its employees to the appropriate government agencies or benefit providers in the ordinary course of business. Debtor also is requesting that it be authorized to pay the Trust Funds Taxes to the appropriate agencies in the ordinary course of business. Those withholdings are not property of Debtor's estate but rather of each individual employee and will not diminish the funds available for the Debtor's creditors.

38. The application in support of the Wage Motion sets forth the legal authority for the relief sought. Debtor respectfully requests that the court enter an order granting that relief in that the payments to be made to or on behalf of Debtor's employees do not exceed the allowed priority of such claims pursuant to 11 U.S.C. §507. Debtor believes that it would be inequitable to require its employees to forego payments of amounts owed at this time which likely will be paid in the future as priority claims in any distribution to be made pursuant to a confirmed plan of reorganization in this matter.

315500702.3

**C.  Debtor's Motion to Maintain Existing Bank Accounts and to Continue to Use its Existing Cash Management System and Business Forms.**

39. Also submitted herewith is Debtor's motion authorizing Debtor to maintain its existing bank accounts and to continue to use its existing cash management system and business forms.

40. Debtor is advised that the Office of the United States Trustee has established certain guidelines for a debtor in possession that operates its business (the "Guidelines").

41. The Guidelines require debtors-in-possession, among other things, to close all existing bank accounts and open new bank accounts bearing the designation "debtor-in-possession" consisting of (a) an operating account to process all post-petition receipts and disbursements from the operation of a debtor's business, and (b) a tax account into which all funds (including, but not limited to, funds held in trust for employee taxes) as may be collected and payable during the pendency of the case shall be deposited.

42. Requiring Debtor to close its existing bank accounts would be disruptive to Debtor's efforts to conduct a successful reorganization and would not be in the best interests of Debtor's estate.

43. Debtor will take the necessary steps to ensure that there is a demarcation of pre-petition and post-petition business.

**D.  Debtor's Motion for an Interim Order and a Final Order Prohibiting Utility Companies from Discontinuing, Altering or Refusing Service, Deeming Utility Companies to Have Adequate Assurance of Payment, and Establishing Procedures for Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. § 366.**

44. In connection with the operation of its business, Debtor obtains electricity, telephone and other similar services (collectively, the "Utility Services") from at least one utility company (collectively, the "Utility Companies").

45. Debtor requests that the Court enter an order (a) prohibiting the Utility Companies from altering, refusing, or discontinuing Utility Services on account of pre-petition invoices, including the making of demands for security deposits or accelerated payment terms, and (b) providing the Utility Companies with "adequate assurance of payment" within the meaning of section 366 of the Bankruptcy Code.

46. If the Utility Companies are permitted to terminate Utility Services, there would be immediate, severe and disastrous consequences caused by the resulting interruption in power and essential services. Interruption could also directly and severely impact guest health and safety. It is self-evident that Debtor cannot operate without power. Any interruption of the Utility Services will substantially diminish Debtor's continued ability to operate and hamper a successful reorganization. It is therefore critical that the Utility Services continue uninterrupted.

47. Debtor proposes to provide adequate assurance of payment to the Utility Companies for Utility Service provided to Debtor following the Petition Date in the form of a cash deposit equal to two weeks average consumption pursuant to 11 U.S.C. § 366(c)(1). Debtor submits that such cash deposit will provide adequate assurance to the Utility Companies of payment for future services.

I certify under penalty of perjury that the above statements made by me are correct. I am aware that if any of the above statements made by me are willfully false, I am subject to punishment.

/s/ Albert Franco

Dated: August 3, 2023

315300783.3